IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALEX R. MABRY, | ) | CASE NO. 1:25-cv-01144-BYP |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

## I.    Introduction

Plaintiff Alex R. Mabry ("Mabry") seeks judicial review of the final decision of the

Commissioner of Social Security, denying her application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ")

failed to apply proper legal standards, I recommend that the Commissioner's final decision

denying Mabry's DIB and SSI be vacated and remanded for further consideration.

## II.    Procedural History

Mabry protectively filed for DIB and SSI in August 2022, alleging a disability onset date

of March 25, 2021. (Tr. 284-96). The claims were denied initially and on reconsideration. (Tr.

80-81, 110, 123). Mabry then requested a hearing before an ALJ. (Tr. 162-63). Mabry,

represented by counsel, and a Vocational Expert ("VE") testified before an ALJ on May 10,

2024. (Tr. 42-79). On May 21, 2024, the ALJ issued a written decision finding Mabry not

disabled. (Tr. 14-35). The Appeals Council denied her request for review on April 8, 2025,

1

making the hearing decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 404.955, 404.981). Mabry timely filed this action on June 2, 2025. (ECF Doc. 1).

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Mabry was born September 14, 1991. (Tr. 290). She was 29 years old on her alleged onset date, making her a younger individual aged 18-49 according to agency regulations. (Tr. 33). She has at least a high school education. (*Id.*). She has past relevant work as a Customer Service Clerk, DOT 299.367-010, SVP 4, light as generally performed, sedentary as actually performed; as a Cashier, DOT 211.462-014, SVP 3, generally and actually performed at light, and as a Server, DOT 311.477-030, SVP 3, generally and actually performed at light. (*Id.*).

### B.    Relevant Medical Evidence

On May 21, 2020, Mabry attended an appointment with Amber Thompson, CNP, to establish care. (Tr. 447-49). She reported symptoms including depressed mood, fatigue, hopelessness, worthlessness, irritability, nervousness, and anxiety. (Tr. 447). CNP Thompson referred her to counseling and determined they would reassess in one month to decide whether medication management would be appropriate. (Tr. 448). When Mabry returned to see CNP Thompson on June 15, 2020, CNP Thompson prescribed a trial of Wellbutrin to treat depression and anxiety, and also prescribed Keflex to treat a rash on her left foot. (Tr. 453). On July 9, 2020, Mabry was assessed with atopic dermatitis and prescribed prednisone. (Tr. 460).

At a July 14, 2020 follow up appointment, Mabry's blood sugar was elevated and her A1c measured at 9.3. (Tr, 461). She was assessed with type II diabetes mellitus without complication and further noted that her mood had improved with the trial of Wellbutrin. (Tr. 461-63). At an October 13, 2020 visit, Mabry reported that she had improved her diet and

increased her exercise helping her to lose five pounds, and decreased her A1c to 6.9, (Tr. 469), but by January 28, 2021, she had fallen back to her prior eating and exercise habits, causing her to gain eight pounds, and her A1c to rise to 8.4. (Tr. 473).

At an April 9, 2021 appointment with CNP Thompson, Mabry reported that her "anxiety and life is spinning out of control," and that she had experienced "a panic attack and mental break down." (Tr. 478). She noted feeling depressed and anxious all of the time, and it was affecting her eating and sleeping patterns. (*Id.*). CNP Thompson discontinued Wellbutrin, and prescribed Effexor. (Tr. 480). At a May 3, 2021 follow up appointment, Mabry indicated the Effexor had helped manage her anxiety but caused her to feel drowsy during the day, and to have trouble falling asleep at night. (Tr. 481). Her A1c had increased to 8.9. (*Id.*). By June 8, 2021 Mabry had decided to discontinue taking Effexor and reported ongoing anxiety and depression symptoms. (Tr. 487).

Mabry was treated by CNP Becky Lea Jensen of Ohio Health Primary Care Women's Health on September 30, 2021, for type II diabetes mellitus, anemia, and depression. (Tr. 500). She reported symptoms including depressed mood, excessive worry, feelings of hopelessness and worthlessness, irritability, nervousness/anxiety, panic, and restlessness, and indicated that the symptoms were interfering with her daily activities. (Tr. 500-06). She reported similar symptoms to CNP Jensen on December 22, 2021, leading CNP Jensen to recommend that Mabry schedule an appointment with psychiatry. (Tr. 533-37).

On March 7, 2022 Mabry attended a follow up appointment and reported that she was not doing well with her symptoms of post-traumatic stress disorder ("PTSD"). (Tr. 561). Specifically, she stated she was feeling depressed and had low self-esteem, and felt worthless,

empty, and abandoned. (*Id.*). She was diagnosed with PTSD, personality disorder, and binge eating. (Tr. 562).

Mabry underwent an MRI of her left foot on April 12, 2022 which revealed subcutaneous edema and enhancement of the dorsum of the fore- and mid-foot, possibly correlated to underlying cellulitis. (Tr. 632). On June 21, 2022, Mabry reported having severe daily anxiety but noted that she had begun taking Topamax and it had improved her binge eating and impulsivity. (Tr. 564). At a July 11, 2022 office visit her A1c measured at 7.1, and she indicated she had begun taking her diabetes medication. (Tr. 540).

Mabry attended an appointment with a podiatrist on August 26, 2022, due to changes in her left foot, including discoloration. (Tr. 566). She described her left foot as feeling "tighter" than her right and noted decreased mobility in her left digits and ankle. (*Id.*). She was assessed with a mass of soft tissue of the foot, dermatitis, type II diabetes mellitus, left foot pain and class 3 severe obesity. (Tr. 569).

Although Mabry had reported at an October 13, 2022 office visit that her PTSD symptoms had improved (Tr. 587), at a February 8, 2023 appointment she reported her symptoms had not improved and she was feeling frustrated and confused. (Tr. 613). She stated her anxiety was severe, she was forgetful and would "spiral" when she felt stressed. (*Id.*). She underwent a diagnostic mental health assessment on February 10, 2023, and revealed that she had experienced abuse as a child. (Tr. 618-20). She also reported that she had poor short-term memory and was easily distracted to the point that she felt she might have an attention deficit disorder. (Tr. 620). She further suggested that she was impulsive, that she has social anxiety, and that she hates herself more than she feels angry toward others. (Tr. 620-21). She was assessed with a generalized anxiety disorder, social anxiety, agoraphobia, major depressive disorder,

4

PTSD, personality disorder (most likely bipolar disorder), eating disorder, and kleptomania. (Tr. 624).

On March 10, 2023, Mabry complained of increasing pain in her left foot, reporting she could only stand for 30 minutes at a time. (Tr. 626). She was assessed with a mass of soft tissue, neuritis, left sinus tarsitis, dermatitis, left foot pain, and obesity. (*Id.*). At an office visit on March 28, 2023, Mabry's A1c measured at 7.3, her depression and anxiety were described as "currently stable and controlled with her current treatment plan," and she was assessed with morbid obesity with a BMI of 40.0 or higher. (Tr. 660). On June 6, 2023 she had a left foot punch biopsy which revealed palisading granulomatous dermatitis, most consistent with late-stage necrobiosis lipodica. (Tr. 718). She was prescribed orthotics that she began wearing on August 1, 2023. (Tr. 701).

Mabry attended a mental health consultative exam with Christine Norris, Ph.D., on October 19, 2023, where she indicated she was unable to handle stress and was unable to deal with other people. (Tr. 649). She reported isolating herself, and suffering from severe anxiety, depression, and PTSD that had prevented her from working for two years. (*Id.*). She spends some time with close friends and family. (Tr. 650). She had a history of bingeing and purging, and some history of suicidal ideations and cutting. (*Id.*). She had not been in counseling since May 2023. (Tr. 651). Her symptoms included frequent worrying, sleep disturbance, difficulty concentrating, irritability, easy fatigue, restlessness, and some history of panic attacks. (Tr. 652). She was diagnosed with major depressive disorder, recurrent, moderate; and genralized anxiety disorder with panic attacks. (Tr. 653).

On December 19, 2023, Mabry complained of left foot pain and instability. (Tr. 691). She reported her foot will vibrate and shake when she walks, and her ankle is unstable. (*Id.*). While

orthotics have helped, she is still only able to be active for about an hour at a time. (*Id.*). Mabry attended an initial occupational therapy assessment on January 22, 2024 leading to a functional diagnosis of weakness in her bilateral hands, bilateral carpal tunnel syndrome, pain in both wrists and hands, dorsalgia, cervicalgia, and bilateral leg weakness. (Tr. 829). She began occupational therapy on February 29, 2024 to treat bilateral foot pain and bilateral carpal tunnel syndrome. (Tr. 756). At an office visit on March 19, 2024, Mabry reported that occupational therapy had provided noticeable improvement in both feet, allowing her to get out more often. (Tr. 768). She was assessed with anterior tibialis tendinitis of the right foot; palisaded neutrophilic and granulomatous dermatitis; and type II diabetes mellitus. (*Id.*). On April 5, 2024, she had completed 10 occupational therapy sessions and had made significant progress toward her goals. (Tr. 823).

### C.     Medical Opinion Evidence

#### 1.     State Agency Reviewing Opinion Evidence

On October 30, 2022, state agency reviewing psychologist Jennifer Swain, Psy.D., opined that Mabry had mild limitations in the domain of understanding, remembering and carrying out instructions, and moderate limitations in the domains of interacting with others; concentration, persistence, and maintaining pace; and adapting and managing oneself. (Tr. 84). Dr. Swain found Mabry had moderate limitations in her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; her ability to interact appropriately with the general public; her ability to accept instructions and respond appropriately to criticism from supervisors; and her ability to respond appropriately to

changes in the work setting. (Tr. 87-88). On November 9, 2023, state agency reviewing psychologist Joel Forgus, Ph.D., adopted Dr. Swain's opinion, but included an additional moderate restriction on her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 107-08).

On November 7, 2022, state agency reviewing physician W. Scott Bolz, M.D., opined that Mabry was capable of performing work at the light exertional level, with the additional limitations that she could never climb ladders, ropes or scaffolds; and she should avoid all exposure to hazards such as unprotected heights and hazardous machinery. (Tr. 85-86). State agency reviewing physician Mehr Siddiqui, M.D., opined on July 26, 2023 that Mabry was capable of performing work at the light exertional level, but was limited to four hours standing or walking during an eight-hour workday could occasionally climb ramps or stairs but could never climb ladders, ropes or scaffolds; could frequently stoop, kneel or crouch, but only occasionally crawl; and could have no exposure to unprotected heights, hazardous moving machinery, or commercial driving. (Tr. 105-07).

### 2.      Consultative Examiner Opinion Evidence

On October 19, 2023, consultative examiner Dr. Norris opined that Mabry should be able to carry out instructions and remember multi-step instructions. (Tr. 653-54). She would likely demonstrate work pace commensurate with peers, but may have periods away from work due to her mental health. (*Id.*). Her ongoing mental health difficulties may cause some difficulties in social interaction and compromise her overall ability to tolerate stress. (*Id.*).

### D.      Administrative Hearing Evidence

Mabry testified before an ALJ on May 10, 2024. (Tr. 48-70). She stated that she had not worked since October 2022, and that her last employment was a short-term seasonal job at a

7

haunted house. (Tr. 48). She has a high school diploma and has attended a couple of years of college. (Tr. 53). She is 5'9", and her current weight is 279 pounds, although her weight tends to fluctuate. (Tr. 53-54). She reports that at times she will binge eat and then purge, although she denies having bulimia. (Tr. 54). She does not have a driver's license and relies instead on friends and family for transportation. (Tr. 55). She has never been able to take the driver's test due to anxiety and nervousness. (Tr. 55-56).

Mabry testified that she has diabetes, and that her blood sugar will spike and drop. (Tr. 56). She tries to be careful in managing what she eats because she is concerned about neuropathy in her feet and the risk of losing a limb. (*Id.*). She does not check her blood sugar regularly and tries to manage her diabetes with medication. (Tr. 57). She also has an inflammation issue in her feet, most notably the left, that she believes is due to bursitis, tendonitis, and osteoarthritis. (Tr. 56-57). Her inflammation will flare up with extended periods of standing or walking. (Tr. 57). Her left foot inflammation also results from dermatitis that will get irritated when she wears shoes. (Tr. 57-58).

Mabry added that she has recently been diagnosed with carpal tunnel syndrome in her bilateral hands. (Tr. 58). Testing revealed she had weaker grip strength than other people but did not realize it because she has been dealing with it for her whole life. (*Id.*). She has wrist splints she wears to bed, and she tries to only use her hands for 20 minutes at a time. (Tr. 59). She has also been seeing a physical therapist to work on grip strength and flexibility. (*Id.*). She has had to limit one of her favorite activities, drawing, to about 40 minutes, because after that she will experience "a little bolt of lightning" traveling from her thumb to her wrist. (*Id.*). She also reported a "bad disc in my back." (Tr. 60).

With regard to her mental health, Mabry testified that her anxiety "essentially rules" her life. (*Id.*). Her anxiety affects her ability to make interpersonal connections and impacts her ability to interact with strangers and manage her life. (*Id.*). She experiences great difficulty with normal social behaviors and has brain fog that affects her memory. (*Id.*). She has crying spells, and her emotions fluctuate uncontrollably. (Tr. 60-61). She does not have the energy or motivation for household chores and knowing that she needs to do them causes her to feel frustrated and anxious. (Tr. 61). She can only be productive at completing household chores for about 15 minutes at a time. (*Id.*). She will do her own grocery shopping but tries to do it at odd hours when the store will be less crowded. (Tr. 62). She limits herself to preparing simple foods and primarily lives on pasta. (Tr. 63). She showers routinely, but does not brush her hair, and will forget to brush her teeth. (Tr. 63-64). She cannot handle stress. (Tr. 64).

Mabry testified that she had "a mental breakdown" in March 2021 that caused her to leave a job. (Tr. 68). She reported having panic attacks at that time and crying at the idea of having to go to work. (*Id.*). She began to self-isolate, knowing that otherwise she would have required hospitalization. (Tr. 68). Since then, she has been taking mental health medications, but they have not been very helpful. (Tr. 69). She has tried many different medications that either were not helpful or had significant side effects such as fatigue. (*Id.*).

After Mabry concluded her testimony, VE Gwendolyn Ligon testified. (Tr. 70-79). Ligon testified that Mabry had past relevant work as a customer service clerk, DOT 299.367-010, SVP 4, generally performed at the light exertional level, actually performed at sedentary; as a cashier, DOT 211.462-014, SVP 3, generally and actually performed at light; and as a server, DOT 311.477-030, SVP 3, generally and actually performed at light. (Tr. 71-72). The ALJ then posed her first hypothetical, asking the VE to consider an individual of the same age, education, and

work experience as the claimant, who is capable of performing work at the light exertional level, but with the following limitations; the individual would be limited to up to four hours standing or walking in an eight-hour workday; could never climb ladders, ropes, or scaffolds, and only occasionally climb ramp or stairs, as well as crawl; could frequently stoop, kneel or crouch; must avoid exposure to all hazards, and must avoid exposure to extreme heat; could frequently handle or finger with the bilateral upper extremities; is able to understand, remember and carry out simple instructions; cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas; cannot interact with the public as part of the job duties; can occasionally interact with co-workers and supervisors, and all communication is limited to the straight-forward exchange of information without negotiation, persuasion or conflict resolution; and can deal with occasional changes in a routine work setting. (Tr. 72). The VE opined that this individual was precluded from Mabry's past work but was capable of working as a mail clerk, DOT 209.687-026, SVP 2, light exertion, with 11,000 jobs estimated in the national economy; as a merchandise marker, DOT 209.587-034, SVP 2, light exertion, with 137,000 jobs estimated in the national economy; and as a routing clerk, DOT 222.687-022, SVP 2, light exertion, with 118,000 jobs estimated in the national economy. (Tr. 73).

For her second hypothetical, the ALJ asked the VE to consider the same limitations from the first hypothetical, but further reduced the individual to the sedentary exertional level. (*Id.*). Here, where the hypothetical individual is limited to four hours standing/walking, as in the first hypothetical, the VE opined that the individual would be capable of performing the same jobs as in the first hypothetical, with the estimated numbers of jobs available reduced by 50%. (Tr. 74). If the hours standing/walking is reduced to 2 hours, consistent with the sedentary exertional level, the individual could work as a sorter, DOT 521.687-086, SVP 2, sedentary exertion, with

10

1,800 jobs estimated in the national economy; as a document preparer, DOT 249.587-018, SVP 2, sedentary exertion, with 15,500 jobs estimated in the national economy; and as a surveillance system monitor, DOT 379.367-010, SVP 2, sedentary exertion, with 7,300 jobs estimated in the national economy. (*Id.*).

For a third hypothetical, the ALJ asked if the individual from either the first or the second hypothetical were to require the ability to work in isolation, would either individual be able to perform work in the national economy. (Tr. 77). The VE opined that this limitation would be work preclusive for either individual. (*Id.*). The VE noted that if an employee would require more than the normal two 15-minute breaks and 30-minute lunch break, that would require an accommodation. (*Id.*). The VE further opined that employers will tolerate up to 10% of the workday off-task, and one to two absences per month during a short probationary period of 30 to 60 days, after which even one absence per month on an ongoing basis would be met with reprimand up to termination, meaning up to six absences per year may be tolerated. (*Id.*).

## IV.     The ALJ's Decision

In her decision dated May 21, 2024, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.

2.     The claimant has not engaged in substantial gainful activity since March 15, 2021, the alleged onset date (20 CFR 404.1571 *et seq*. and416.971 *et seq.*).

3.     The claimant has the following severe impairments: degenerative disc disease and osteoarthritis; bilateral carpal tunnel syndrome; type II diabetes mellitus; dermatitis; obesity; anxiety; depression, and posttraumatic stress disorder (20 CFR 416.920(C) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

11

5. After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967 (b) except she can stand and/or walk up to 4 hours in an 8-hour workday; she can never climb ladders, ropes, or scaffolds; she can occasionally climb ramps and stairs, and crawl; she can frequently stoop, kneel, and crouch; she can frequently handle and finger with the bilateral upper extremities; she must avoid exposure to extreme hot; and she must avoid exposure to all hazards. Mentally, the claimant can understand, remember and carry out simple instructions; she cannot perform work requiring a specific production rate, such as assembly line work or work that requires hourly quotas; she cannot interact with the public as part of job duties; she can occasionally interact with coworkers and supervisors, and all communication is limited to the straightforward exchange of information without negotiation, persuasion, or conflict resolution; and she can deal with occasional changes in a routine work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 14, 1991 and was 29 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8. The claimant has at least a high school education (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a famework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. 404 Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569a, 416.969 and 416.969a)

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 25, 2021, through the date of this decision (20 CFR 404.1520(g) 416.920(g)).

(Tr. 14-29).

### V.      Law and Analysis

#### A.      Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of
impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals
any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his
RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they
can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th

Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant

bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus,

entitled to benefits. 20 C.F.R. § 404.1512(a).

#### B.      Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is

supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C.

§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the

substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S.

Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

13

mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the

14

court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.     Discussion

Mabry raises two distinct issues for this Court's review:

> 1.  Whether the ALJ properly evaluated the medical opinion evidence and prior administrative medical findings.
>
> 2.  Whether the ALJ properly evaluated Mabry's subjective complaints.

(ECF Doc. 8, p. 1).

### A.     While the ALJ properly evaluated the opinion of the consultative examiner, she did not properly evaluate the  prior administrative medical findings.

#### 1.     Prior Administrative Medical Findings

Mabry argues that in her review of the prior administrative medical findings ("PAMF") of state agency reviewing psychologists Jennifer Swain, Psy.D., and Joel Forgus, Ph.D., the ALJ erred by failing to make a persuasiveness finding as required by 20 C.F.R. § 404.1520c(b). (*Id.* at p. 14). Mabry also contends that the ALJ failed to address the issue of supportability and mischaracterized the evidence on which she based her opinion. (*Id.* at pp. 15-16). Mabry notes that the PAMFs rely on examination notes from CNP Jensen to justify their findings, despite Mabry receiving her mental health care at that juncture from her psychiatrist, Dr. Molina. (*Id.* at pp. 15-18). Mabry argues that the ALJ misapplied SSR 17-2p when evaluating the persuasiveness of the PAMFs, as SSR 17-2p is intended to apply to the determination of whether the claimant medically equals a listing. (*Id.* at p. 19). Finally, Mabry asserts that the ALJ incorrectly posited that the residual functional capacity ("RFC") she found was more restrictive that those determined in the PAMFs, and that the ALJ further erred by suggesting that the PAMFs were not rendered in vocationally relevant terminology. (*Id.* at p. 20).

The Commissioner retorts that substantial evidence supports the ALJ's determination that the PAMFs were not fully persuasive. (ECF Doc. 10, p. 5). While agreeing that the ALJ did not explicitly assign a level of persuasiveness to the PAMFs, the Commissioner argues a specific incantation of a level of persuasiveness is not required for a decision to be upheld. (*Id.*). Further, although the ALJ did not specifically use the word "supportability" in her assessment of the PAMFs, she did point to evidence in the record to justify her determination of the supportability of the PAMFs, and to show inconsistencies with the evidence. (*Id.* at pp. 5-6). Finally, the Commissioner argues that this Court should reject Mabry's attack on the ALJ's evaluation of the PAMFs because the ALJ ultimately found a more restrictive RFC than those opined by the PAMFs. (*Id.* at p. 6).

The evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1520c. This regulation mandates that the ALJ "will not defer or give any evidentiary weight, including controlling weight to any medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must evaluate each medical opinion's persuasiveness based on its: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and, (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c); *see also Heather B. v. Comm'r of Soc. Sec.,* No. 3:20-cv-442, 2022 WL 3445856 (S.D. Ohio Aug. 17, 2022). Supportability and consistency are the most important factors; ALJs must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative findings in [their] determination or decision." 20 C.F.R. § 404.1520c(b)(2). ALJs "may, but are not required to," consider factors three through five when evaluating medical source opinions. (*Id.*).

16

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and non-medical sources in the claim, the more persuasive the medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(c)(2).

An ALJ must "provide a coherent explanation of his [or her] reasoning. *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom., Lester v. Comm'r of Soc. Sec.,* No. 5:20-cv-01364. 2021 WL 119287 (N.D Ohio, Jan. 13, 2021). The ALJ's medical source opinion evaluation must contain a "minimum level of articulation" to "provide sufficient rationale for a reviewing adjudicator or court." *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 2017 WL 168819, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017). If an ALJ does not "meet these minimum levels of articulation," it "frustrates this [C]ourt's ability to determine whether her disability determination was supported by substantial evidence." *Heather B.*, 2022 WL 3445856, at *3, *citing Warren I. v. Comm'r of Soc. Sec.,* No. 5:20-cv-495, 2021 WL 860506, at *8 (N.D.N.Y., Mar. 8, 2021).

Mabry correctly points out that the ALJ did not explicitly indicate the level of persuasiveness she afforded the PAMF's. While the absence of a persuasiveness finding does not meet the express guidance of 20 C.F.R. §404.1520c(b) ("We will articulate in our determination or decision how persuasive we find all of the medical opinions . . . in your case record."), it can be overcome be a fulsome discussion of consistency and supportabilty that builds an accurate and logical bridge between the evidence of record and the ALJ's conclusions. *See Bryan T. v. Dudek,* 799 F. Supp. 3d 943, 956 (N.D. California 2025). Thus, the failure to state an explicit

17

finding of the overall persuasiveness of the PAMFs in and of itself would be harmless error if the issues of consistency and supportability are properly articulated. *See id.*, *see also Rabbers*, 582 F.3d at 654 (explaining that an ALJ's failure to use an "adjudicatory tool" that does not change the outcome of the decision is harmless).

Certainly, even if other courts have found it harmless error, *Bryan T.,* 799 F. Supp. 3d at 956, failing to state the persuasiveness of an opinion makes it difficult for subsequent reviewers to decipher how the ALJ evaluated a medical expert's opinion. This difficulty, coupled with the ALJ's failure to address the "most important" factor of supportability, leads me to recommend remand. These two errors, when taken together, do not provide this Court with sufficient analysis to aid in its review.

Even so, the ALJ did write extensively concerning how she evaluated the PAMFs:

While the undersigned agrees that the claimant has mental limitations, the undersigned finds that the reviewing psychological consultants did not provide their opined limitations in vocationally relevant terminology. Thus, based on the evidence which shows no more than moderate mental limitations, the undersigned has refined such limitations into the above residual functional capacity using proper terminology. This is consistent with the overall evidence, showing some deficits, but normal mental status examinations and stability with treatment. That being said, additional medical evidence received in the course of developing the claimant's case for review at the administrative hearing level, as well as evidence in the form of persuasive testimony from the claimant at the hearing, consistent with the medical evidence in the record, justifies a conclusion that the claimant's mental impairments are more limiting than was concluded by the state agency reviewing psychological consultants (SSR 17-2p). Nor did the reviewing psychological consultants adequately consider the claimants subjective complaints or the combined effect of the claimant's mental impairments and symptomology. Given the record in totality, the undersigned finds the record now supports a moderate limitation in the claimant's ability to understand, remember or apply information. Moreover, the evidentiary record, including the claimant's testimony, supports further limitation to no interaction with the public and occasional interaction with coworkers and supervisors that is limited to the exchange of information without negotiation, persuasion or conflict resolution.

(Tr. 32).

While the ALJ explained in detail why she found the PAMFs to be "consistent with the overall evidence," she further clarifies why the record supported more restrictive mental health limitations. Specifically the ALJ addressed the element of consistency by noting that "medical evidence received in the course of developing the claimant's case for review at the administrative hearing level, consistent with the medical evidence in the record, justifies a conclusion that the claimant's mental impairments are more limiting than was concluded by the state agency reviewing psychological consultants." (*Id.*).

The ALJ does not, however, address the element of supportability in any meaningful way. (*Id.*). This Court is obliged to review the ALJ's decision to determine whether the ALJ "applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). The ALJ's evaluation of the PAMFs, owing to its failure to addresss supportability, does not comport to the proper legal standards, and therefore cannot survive scrutiny. Without addressing this key issue, a subsequent reviewer is left unaware of how the ALJ assessed the PAMFs. Accordingly, I recommend remand on this issue.

Mabry further contends that the ALJ's determination of the persuasiveness of the PAMFs was based on a a mischaracterization of the evidence, specifically referencing the ALJ's claim that the PAMFs were "consistent with the overall evidence, showing some deficits, but generally normal mental status examinations and stability with treatment." (Tr. 32). Mabry cites several examination notes in the record written by her treating psychiatrist Carlos Molina Arriola, M.D., that describe symptomology Mabry contends are inconsistent with "generally normal mental status examinations." (ECF Doc. 8, at p. 17). These notes include symptoms such as restless and fidgety behavior, not good mood, constricted affect, fair insight, fair judgment, frustration,

19

severe anxiety, poor memory, low motivation, difficulty tolerating stressors and thoughts of death. (*Id.*). Mabry further suggests that, despite the ALJ's claims otherwise, the ALJ's RFC determination is not in fact more restrictive than the PAMFs. (*Id.* at pp. 19-21).

While it can be debated whether the symptoms noted by Dr. Arriola exceed a characterization of "some deficits," the suggestion that the ALJ's RFC is not more restrictive than those opined by Drs. Swain and Forgus in the PAMFs is simply not accurate. After writing that Drs. Swain and Forgus "did not adequately consider [Mabry's] subjective complaints or the combined effect of the claimant's mental impairments and symptomology" (Tr. 32), the ALJ found that Mabry had moderate limitations in her ability to understand, remember and apply information, whereas the PAMFs found only mild limitations. (*Id.*). This led to a limitation in the RFC restricting Mabry to understanding, remembering and carrying out simple instructions, with a prohibition of work requiring a specific production rate or work that requires hourly quotas. (Tr. 25). This limitation exceeds that suggested by the PAMFs. (Tr. 84, 102-03). The ALJ found that the record "supports *further* limitation to no interaction with the public and occasional interaction with coworkers and supervisors that is limited to the exchange of information without negotiation, persuasion or conflict resolution." (Tr. 32). (emphasis added). This exceeds the moderate limitation Dr. Swain suggested for interaction with the public and co-workers, and that Dr. Forgus extended to coworkers. (Tr. 84, 102-03). Thus, the opinions of Drs. Swain and Forgus do not support the suggestion that greater restrictions were necessary than those assessed by the ALJ, and any perceived error accrued to Mabry's benefit. *Kopcial v. Kijikazi,* 1:23-cv-00201, 2024 WL 1131059, at *3 (N.D. Ohio Mar. 15, 2024); *see also, Laney v. Comm'r of Soc. Sec.* 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022) ("The Court wll not fault the ALJ for

finding more restrictions than the state agency opined."). Accordingly, this is not cause for remand.

Finally, Mabry posits that the ALJ improperly cited to SSR 17-2p in its evaluation of the persuasiveness of the PAMFs, as SSR 17-2p applies to the determination of whether a listing is met or equalled at Step 3 of the sequential analysis. (ECF Doc. 8, at p. 19). Mabry writes, "Given that the ALJ cited to SSR 17-2p when evaluating the mental and physical PAMF's and the ALJ otherwise failed to comply with the revised regulations, it is unclear what role SSR 17-2p had when the ALJ evaluated the persuasiveness of the findings, and the errors require remand." (*Id.*). Mabry is correct, in both that SSR 17-2p is correctly applied at Step 3 of the sequential analysis, rather than in the evaluation of medical expert evidence, and in that it is unclear what role SSR 17-2p played in the evaluation of the PAMFs. Although likely not worthy of remand as a standalone issue, the Court remains unable to ascertain the effect of the ALJ's reference to that regulation.

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulation and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007). Here, as noted above, the ALJ's evaluation of the PAMFs failed to address the issue of supportability and provided no articulation of their persuasiveness. Therefore, substantial evidence does not undergird the assessment. It is for this reason I recommend remand.

### 2.     Consultative Examiner Christine Norris, Ph.D.

Mabry argues that the ALJ failed to follow regulations and failed to indicate the level of persuasiveness afforded to Dr. Norris' opinion. (ECF Doc. 8, p. 21). Contrary to the ALJ's

21

findings, Mabry argues that Dr. Norris' assessed limitations were expressed in vocational terms, and were not properly accounted for in the RFC determination. (*Id.* at p. 22). Specifically, the ALJ did not articulate why she failed to incorporate Dr. Norris' suggested limitations for time off task and absenteeism into the RFC.

The Commissioner, on the other hand, argues that substantial evidence supports the ALJ's determination that Dr. Norris' opinion was only somewhat persuasive. (ECF Doc. 10, p. 7). In the Commissioner's view, the ALJ provided numerous reasons for finding the opinion somewhat persuasive, including the lack of a longitudinal treating relationship, the use of "speculative and inconclusive terminology," Mabry's ability to perform her activities of daily living, and examination notes from the consultative examination indicating a mostly benign presentation. (*Id.* at pp. 7-8).

Again, as above, the evaluation of Dr. Norris' opinion is governed by 20 C.F.R. § 404.1520c, which mandates that the ALJ explain how she considered the factors of supportability and consistency when assessing the opinion's persuasiveness. The ALJ addressed supportability by noting that Dr. Norris' opinion was borne from a one-time examination, without forming a longitudinal relationship, and there was therefore no treatment history to form a supportive basis of the opinion . (Tr. 32). The ALJ added that Dr. Norris did have the "opportunity to observe, interview and objectively evaluate the claimant before offering her opinion," providing some basis for the supportability of the opinion. (*Id.*). The ALJ also addressed the consistency factor, writing that "the undersigned finds Dr. Norris' clinical observations and objective findings somewhat persuasive to the extent that they are generally consistent with the record at the hearing level." (*Id.*). Additionally, although not required to do so, the ALJ noted that her view of the persuasiveness of the opinion was impacted by the failure

to use vocationally relevant terminology and the use of vague language that "renders those statements and her overall assessments speculative and inconclusive." (*Id.*). The ALJ therefore met her burden of articulation of the supportability and consistency factors and provided the requisite substantial evidence for her finding that Dr. Norris' opinion was somewhat persuasive. Remand is not appropriate on this basis.

### B.  The ALJ properly evaluated Mabry's subjective allegations.

Finally, Mabry argues that the ALJ failed to provide reasons for discounting her subjective allegations, as a significant portion of the record was either mischaracterized or was omitted from the ALJ evaluation of the evidence. (ECF Doc. 8,  pp. 22-23). Mabry argues that the ALJ's determination that counseling and medication has been effective in managing Mabry's mental health symptoms is unsupported by the record, as her mental health treating sources have consistently noted abnormal mental status examination findings and ongoing symptoms. (*Id.* at p. 23). Mabry also takes contention with the ALJ's finding that the "totality of the objective medical evidence shows that the claimant consistently presented as nothing other than polite and cooperative and with appropriate manner and mood during office visits[,]" claiming instead that the totality of her mental health treatment notes were abnormal. (*Id.* at p. 24).

The Commissioner responds that the ALJ properly evaluated her subjective symptoms and that determination should be given great weight and deference. (ECF Doc. 10, p. 8). The Commissioner asserts that Mabry is merely inviting this Court to review the evidence de novo, and that such an exercise is beyond this Court's purview. (*Id.* at pp. 10-11). Because substantial evidence supports the ALJ's evaluation of Mabry's subjective allegation, the Commissioner argues that the decision should not be disturbed.

23

When a plaintiff alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating those symptoms. *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2017 WL 5180304, *2-3 (Oct. 25, 2017). First, the ALJ must determine whether the individual has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by the claimant, considering objective medical evidence and other information provided by medical sources, and any other relevant evidence on the record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.

Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider:, including: (1) daily activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures other than treatment the individual used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions. SSR 16-3p, 2017 WL 5180304, at *7-8.

In performing this assessment, the ALJ is not required to analyze all seven factors but must still show that she considered the relevant evidence. *Roach v. Comm'r of Soc. Sec.*, No. 1:20-CV-01853-JDG, 2021 WL 4553128, at *10-11 (N.D. Ohio Oct. 5, 2021). Indeed, the ALJ's assessment of an individual's subjective complaints and limitations must be supported by substantial evidence and be based on a consideration of the entire record. *Rogers*, 486 F.3d at 247; *see also Millsap v. Comm'r of Soc. Sec.*, No. 3:19-cv-197, 2020 WL 6275948, at *3 (S.D. Ohio May 27, 2020), *report and recommendation adopted*, No. 3:19-cv-197, 2020 WL 6273402

24

(S.D. Ohio Oct. 26, 2020). Nonetheless, it remains the province of the ALJ and not the reviewing court to assess the consistency of subjective complaints and the impact of a plaintiff's symptoms with the record as a whole. *Rogers*, 486 F.3d at 247 (internal quotations omitted). Therefore, "absent a compelling reason," an ALJ's subjective symptom determination will not be disturbed. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

In her decision, the ALJ met step one of the two-pronged test delineated in SSR 16-3p, finding that Mabry had several severe medical impairments, including anxiety, depression, and PTSD. (Tr. 20). The ALJ further addressed the second prong mandated by SSR 16-3p, noting that the record "does not support the extent of the claimant's subjective complaints regarding her mental limitations." (Tr. 29). With regard to her treatment and medication history, the ALJ wrote that "the medical evidence reveals that counseling and medications have been relatively effective in managing the claimant's symptoms as evidenced by her specific denial of psychological problems many times." (*Id.*). The ALJ also noted that Mabry's nurse practitioner concluded that the claimant's depression with anxiety "was stable and controlled with her current treatment plan and advised her to continue care with her specialist." (Tr. 30). The ALJ considered Mabry's activities of daily living, noting that she presented at an appointment well groomed, and that she could get together socially with friends and family once per week. (*Id.*). The ALJ noted incidents of kleptomania and binge-eating.(*Id.*). The ALJ also documented frequent mentions in the record of the location, duration, frequency, and intensity of Mabry's mental health symptoms, noting that the record is "replete with documentation that her memory, mentation, attention, orientation and cognition were normal and intact," and that Mabry consistently presented as polite and cooperative with appropriate mood and manner at office visits. (*Id.*).

Mabry points out that there is evidence to the contrary in the record, including treatment notes from September 21, 2021, documenting her depressed mood, excessive worry, feelings of hopelessness and worthlessness, irritability, nervousness/anxiety, panic, and restlessness. (ECF Doc. 8,  p. 24). Treatment notes from December 22, 2021 further document similar symptoms. (*Id.*). Nonetheless, I must provide the ALJ's consideration of the symptom statements in this decision with deference on review. And my review of the ALJ's decision reveals that the ALJ considered the evidence and articulated her reasoning consistent with SSR 16-3p's two-part process. (*See* Tr. 22-23). The ALJ names all of Mabry's severe impairments and discusses her review of her activities of daily living, the effects of her treatment and medication, and the impact of her symptoms. (*Id.*). After consideration of this evidence, the ALJ has an available zone of choice within which to make her determination and chose to find her subjective allegations not entirely consistent with her review of the evidence. (*Id.*). With this proper articulation, I must defer. I therefore recommend the District Court affirm as to this issue.

## VII.    Recommendation

Because the ALJ failed to apply proper legal standards when evaluating the PAMFs, I recommend the Commissioner's final decision denying Mabry's application for DIB and SSI be remanded for reconsideration of that issue. The Commissioner need not reassess on the basis of the other issues raised in Mabry's appeal.

Dated: March 3, 2026

Reuben J. Sheperd
United States Magistrate Judge

_____

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\*\*\*

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)

27